**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TRACY VANDERHOEF, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>CHINA AUTO LOGISTICS INC., TONG SHIPING, and WANG XINWEI,<br><br>　　　　Defendants. | Case No.: 2:18-cv-10174-CCC-SCM<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Zhengyu He, Harold Brooks Moss, and Andrew Pagliara ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding China Auto Logistics Inc. ("China Auto" or the "Company"), review and analysis of press releases, analyst reports, public statements, news articles, and other publications disseminated by or concerning

the Company, review and analysis of the Company's conference calls, press conferences, corporate website, and related statements and materials, independent interviews with former employees of the Company conducted by investigators on behalf of Plaintiffs, the allegations of a derivative complaint brought on behalf of the Company by one of its major shareholders, and information readily obtainable on the Internet. Many additional facts supporting the allegations herein are known only to the Defendants and/or are within their exclusive custody or control. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **<u>NATURE OF THE ACTION</u>**

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded securities of China Auto between March 28, 2017 and September 5, 2018, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2.      China Auto is a company coopted by its controlling insiders to siphon off the Company's profits through undisclosed related party transactions. Even aside from the fraudulent scheme, the Company was engaged in undisclosed material related party transactions with its purported suppliers and customers, who were actually affiliates of China Auto and/or controlled by immediate family members of Defendants.

3.      Neither the fraudulent scheme nor the true nature of the related party transactions were disclosed to the Company's public shareholders. In fact, when one of the Company's largest shareholders brought allegations of these related party transactions to the attention of the Company and its Audit Committee, the Company's insiders reacted by stonewalling the internal

investigation, actively preventing independent counsel from completing the investigation. As the Company's false and misleading statements and the insiders' misconduct came to light, the Company's stock price fell precipitously.

4.      China Auto maintains a network of interrelated subsidiaries and companies it claims are its suppliers and customers.  In truth, many of these companies are extensions of China Auto and its controlling officers, specifically its CEO and President, Tong Shiping, and his wife and the Company's Senior Vice President, Cheng Weihong. China Auto's top customers and suppliers each share addresses and leadership personnel with the Company's operating subsidiaries, and some are controlled by direct relatives of Defendant Cheng Weihong.

5.      One of the Company's purported "customers" was central to a fraudulent scheme to divert the Company's profits to entities owned and controlled by Defendants Cheng Weihong and Tong Shiping.

6.      Tianjin Binhai International Automall Ltd. Co. ("Binhai") was listed as one of the Company's major customers in 2016, accounting for 15% of the Company's total net revenues. Through undisclosed agreements, Binhai purchased imported cars from the Company at well below market prices. Binhai would then resell those cars at below-market prices to entities owned and controlled by Cheng Weihong. Those entities would then resell the cars to consumers at market prices, reaping substantial profits that would otherwise belong to the Company.

7.      In early April 2018, a major Company shareholder, Barna Capital Group Ltd. ("Barna") raised allegations of undisclosed material related party transactions involving Tong Shiping and Cheng Weihong. At first, the Company revealed only that it would not be able to timely file its annual report for 2016 because it needed extra time to "identify certain related party transactions."

8.      On April 6, 2018, Barna filed a derivative action in Clark County, NV, alleging the fraudulent scheme to siphon Company profits to entities controlled and owned by Cheng Weihong, for the benefit of her and her husband, China Auto CEO Tong Shiping (the "Derivative Complaint"). *Barna Capital Group Ltd. v. Shiping*, No. A-18-772474-C (Nev. Dist. Ct., Clark Cnty.).

9.      A few days later, the Company announced that its Audit Committee was initiating an investigation into Barna's allegations, that it was retaining independent counsel to conduct the internal investigation, and that the Company intended to fully cooperate with the internal investigation. Three days later the Company disclosed that it faced delisting from NASDAQ due to its failure to timely file its annual report for 2017, but that it planned to submit details to NASDAQ concerning the investigation and its results and the Company's plan to regain compliance.

10.      In May and June 2018, the Company announced that it would not be able to timely file its quarterly report for the first quarter of 2018 and again faced delisting from NASDAQ, due to the ongoing investigation. However, the Company falsely maintained that it was fully cooperating with the investigation and would submit a plan to NASDAQ to regain compliance.

11.      On July 17, 2018, China Auto reported that its CEO, Tong Shiping, and CFO, Wang Xinwei, had resigned as a result of a police investigation initiated by Company employees alleging "violations of data privacy and unlawful forfeiture of personal electronics and email accounts." The Company's report falsely implied that the officers' conduct had occurred in support of the internal investigation, but in fact the opposite was true. Upon this news, NASDAQ immediately halted trading in China Auto stock and requested additional information on the resignations and investigation.

12.     The next day, the Chairman of the Company's Audit Committee resigned. He revealed in his resignation letter that in reality, the Company had been actively *obstructing* the internal investigation. Specifically, he reported that China Auto's management prevented the independent counsel from collecting physical and electronic evidence, denied the independent counsel permission to communicate with the Company's employees or even visit the Company's offices, and prevented independent counsel from conducting any document collection in connection with the investigation. Thus, the Audit Committee Chairman's letter revealed that the officers' resignations were actually due to their efforts to *undermine* the internal investigation, not support it.

13.     In late July 2018, the Company revealed that NASDAQ had determined that the Company had not complied with its requests for additional information concerning the police investigation and internal investigation, and that NASDAQ would be delisting China Auto's stock. When trading of the Company's stock resumed over the counter on gray markets, the stock price dropped by over 70%.

14.     In late August 2018, the Company announced that the independent counsel had withdrawn from its representation and that "[t]he Company does not believe that the Investigation will be completed."

15.     On September 5, 2018, the Company reported that its independent auditor had resigned. The auditor's resignation letter revealed for the first time that the investigation was linked to allegations that the Company failed to disclose sales to entities owned and controlled by Defendants Tong Shipping and Cheng Weihong.

16.     By the time the truth of Defendants' fraudulent scheme had fully come to light, the price of the Company's stock had plummeted to $0.31 on the gray market.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b) and §78t(a)) and Rule

10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

§1331 and §27 of the Exchange Act.

19.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15

U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatement entered, and the subsequent

damages took place within this District.

20.     In connection with the acts, conduct and other wrongs alleged in this Complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the

facilities of the national securities exchange.

## PARTIES

21.     Lead Plaintiff Zhengyu He, as set forth in his shareholder certification and

incorporated by reference herein (Dkt. No. 7-5), purchased China Auto securities at artificially

inflated prices during the Class Period and has been damaged thereby.

22.     Lead Plaintiff Harold Brooks Moss, as set forth in his shareholder certification and

incorporated by reference herein (Dkt. No. 7-5), purchased China Auto securities at artificially

inflated prices during the Class Period and has been damaged thereby.

23.     Lead Plaintiff Andrew Pagliara, as set forth in his shareholder certification and

incorporated by reference herein (Dkt. No. 7-5), purchased China Auto securities at artificially

inflated prices during the Class Period and has been damaged thereby.

24.     Defendant China Auto claims to sell and trade in imported automobiles in the People's Republic of China ("PRC"). The Company is incorporated under the laws of the state of Nevada, but its principal executive offices are located in the Tianjin Province, PRC. China Auto securities traded on the NASDAQ under the ticker symbol "CALI" until trading in the Company's stock was suspended on August 1, 2018. The stock was formally delisted on September 27, 2018.

25.     China Auto is a holding company which has three major wholly-owned subsidiaries through which it conducts its operations: Tianjin Seashore New District Shisheng Business Trading Group Co. Ltd. ("Shisheng"), Tianjin Hengjia Port Logistics Corp. ("Hengjia"), and Tianjin Ganghui Information Technology Corp. ("Ganghui"). Shisheng is the Company's primary operating subsidiary. Shisheng is the 98% owner of both Hengjia and Ganghui, which each shared the same registered business address.[1] Hengjia's business license was revoked on September 13, 2018.[2]  Ganghui's business license was revoked on May 2, 2017.

26.     The Company conducted its sales operations for imported vehicles through Shisheng. Shisheng was an industry leader in the field of auto imports in China. According to Former Employee 1 ("FE 1"), who was employed as a general accountant for Shisheng from August 2014 to August 2016, Shisheng was responsible for about 80% of the auto import volume nationwide as recently as 2015.[3]

---

[1] In the PRC, a company's registered business address is the address contained in the company's registration information filed with the PRC Administration for Industry and Commerce ("AIC"), and is supposed to be the actual address of the business's operations. All references to a business's registered address contained herein are taken from AIC filings.

[2] In the PRC, a company cannot legally conduct business in China without a business license.

[3] FE 1's responsibilities at Shisheng involved general accounting affairs, including organizing annual purchase costs, sales volume and details, and tax issues, among other things.

27.     Defendant Tong Shiping is a founder of the Company and served as the Company's President and Chief Executive Officer ("CEO") since 1995. He also served as the Company's chairman, and a director since 2008. Tong Shiping resigned as a director and officer of the Company on June 29, 2018. Tong Shiping is a resident of the People's Republic of China. Tong Shiping, along with his wife, Defendant Cheng Weihong, control the Company and the Company's board of directors through family relations and other entities under their control.

28.     Defendant Wang Xinwei served as the Company's Chief Financial Officer ("CFO"), Treasurer, and Vice President since 2001. She has also served as a director of Shisheng since at least March 2011. Wang Xinwei resigned as a director and officer of the Company on June 29, 2018. Wang Xinwei is a resident of the People's Republic of China.

29.     Defendant Cheng Weihong is the wife of Defendant Tong Shiping, and was the Senior Vice President (Head of Human Resources and General Administration) of the Company since 1995. She was also a director of the Company during the Class Period. Cheng Weihong is a co-founder, Senior Vice President, legal representative and chairwoman of Shisheng. She was also the supervisor of Hengjia. Cheng Weihong resigned as a director and officer of the Company on December 10, 2017. Cheng Weihong is a resident of the People's Republic of China. Cheng Weihong and Tong Shiping control the Company and the Company's board of directors through family relations and other entities under their control.

30.     Defendant Howard S. Barth served as a director and the chair of the Audit Committee for the Company during the Class Period. Howard Barth is a resident of Canada.

31.     Defendant Lv Fuqi served as a director of the Company and a member of the Nominating and Corporate Governance Committee during the Class Period. Lv Fuqi is a resident of the People's Republic of China.

32.     Defendant Yang Lili served as a director of the Company since 2012, a member of the Audit Committee and Nominating and Corporate Governance Committee during the Class Period. Yang Lili is a resident of the People's Republic of China.

33.     Defendant Bai Shaohua served as a director of the Company since 2016, and was a member of the Audit Committee and chair of the Nominating and Corporate Governance Committee during the Class Period. Bai Shaohua is a resident of the People's Republic of China.

34.     Defendants Howard Barth, Lv Fuqi, Yang Lili, and Bai Shaohua are referred to herein as the "Director Defendants."

35.     Defendants Tong Shiping, Wang Xinwei, and Cheng Weihong are sometimes referred to herein as the "Individual Defendants."

36.     Each of the Individual Defendants:

a.   directly participated in the management of the Company;

b.   was directly involved in the day-to-day operations of the Company at the highest levels;

c.   was privy to confidential proprietary information concerning the Company and its business and operations;

d.   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.  approved or ratified these statements in violation of the federal securities laws.

37.     China Auto is liable for the acts of the Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

38.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to China Auto under *respondeat superior* and agency principles.

39.     Defendant China Auto, the Individual Defendants, and the Director Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Company's Operations

40.     China Auto claims to conduct a "gray market" automobile importation business, also called "parallel importation." The Company purports to purchase luxury vehicles in other countries, primarily North America, and import them to China, where it then sells the imported vehicles to Chinese consumers. In China, luxury cars often sell for over two to three times the price they sell for in North America.

41.     In reality, China Auto sells few, if any, automobiles to consumers. According to the allegations of the Derivative Complaint, there is no physical location in China such as a dealership, store, building or other facility where consumers can go to, or through which they can, purchase cars from the Company. Consumers cannot purchase cars at the Company's offices in China. Consumers in China cannot contact the Company via telephone to purchase car. Consumers in China cannot purchase cars from the Company via the internet. Employees at the Company's office in China have been instructed to inform persons who call that they cannot answer any questions about the Company's business operations.

42.     In recent years, China Auto has reported over $400 million in annual revenue, representing approximately 99% of the Company's total revenues in each year. According to the Company's annual report for the year ending December 31, 2016 filed on Form 10-K with the SEC ("2016 10-K"), the Company's revenues from the sale of imported automobiles and related activities were $581.2 million in 2012 (representing 98.30% of all revenues), $450.1 million in 2013 (98.03%), $393.7 million in 2014 (97.86%), $440.7 million in 2015 (98.74%), and $462.7 million in 2016 (99.07%). However, the Company's profit margins are exceedingly low for the industry. Indeed, in its annual reports, China Auto reported gross profit margins decreasing each year since 2010, falling below 1% in 2015 and 2016. At the same time, according to the allegations of the Derivative Complaint, the Company's competitors report operating margins of around 12%. As one of the largest parallel importers in the PRC with hundreds of millions of dollars in revenue, China Auto should, in theory, be able to enjoy significant economies of scale and market power over its competitors, which it should be able to leverage into margins *superior to* their competitors, not orders of magnitude *lower*.

43.     The reason for the Company's apparent struggles despite its high volume of business are that, unbeknownst to investors, the Company has been engaged in undisclosed material related party transactions with insiders for the purpose of siphoning off the Company's profits for the insiders' benefit.

### The Company Maintains a Complex Network of Interrelated Subsidiaries and Supposed Clients and Suppliers

44.     According to the Company's 2016 10-K, in 2016 China Auto's two major customers were Tianjin Jing Dian Automobile Sales Information Ltd. Co. ("Jing Dian") and Tianjin Binhai International Automall Ltd. Co. ("Binhai"). Jing Dian accounted for 23% of the Company's total net revenues in 2016, and Binhai accounted for 15%. According to the

11

Company's quarterly report for the third quarter of 2017 ("17Q3 10-Q"), Jing Dian accounted for 10% of the Company's total net revenues in the first nine months of 2017, and Binhai accounted for 17%.

45.     *Binhai:* According to AIC registration information, the registered address of Binhai is the same as the Company's subsidiaries, Hengjia and Ganghui: No. 86 Tianbao Avenue, Bonded Area, Tianjin, PRC. More strikingly, both Binhai and Hengjia share the same executive director and general manager, Cheng Tao. Cheng Tao is the nephew of Defendant Cheng Weihong. The chairman of Binhai is Cheng Jun, who is the older brother of Defendant Cheng Weihong (and therefore the brother-in-law of Defendant Tong Shiping). Stated differently, two of China Auto's main operating subsidiaries had the same registered business address and general manager as the Company's supposed major customer, Binhai, the general manager they shared was the nephew of Cheng Weihong, and Binhai's chairman was the brother of Cheng Weihong. Defendant Yang Lili is also a director of Binhai. According to AIC filings, Binhai's business is renting and providing exhibition space for parallel car importers in Tianjin, China. Former Employee 2, who served as Binhai's daily operations manager from October 2009 to August 2018, confirms that Binhai's business was supplying physical locations and support services to car dealers.

46.     *Jing Dian:* According to AIC registration information, the supervisor of Jing Dian is Cao Jingge, who is also the director and general manager of Shisheng. The registered address of Jing Dian is the same as Shisheng's address: No. 110 6th Avenue, Economic and Technological Development Zone, Tianjin, PRC. Former Employee 3, ("FE 3") who served as a mobile application development engineer at Ganghui from September 2013 to September 2018, reported that although he was interviewed for his position by Ganghui, he was asked to sign an employment contract with Jing Dian. During his employment, FE 3 was assigned to develop the internal mobile

application for a website which was registered by Shisheng. FE 3 reported that Jing Dian was operated by China Auto via Ganghui.

47.     According to the Company's 2016 10-K, in 2016 China Auto's two major suppliers were Tianjin Shi Mao International Trading Ltd. Co. ("Shi Mao") and Tianjin Ying Zhi Jie International Logistics Ltd. Co. ("Ying Zhi Jie"). Shi Mao accounted for 16% of the Company's net purchases in 2016, and Ying Zhi Jie accounted for 12%.

48.     **Shi Mao:** According to AIC registration information, the executive director and manager of Shi Mao is Zhang Zhigang, who is also the executive director of Jing Dian.

49.     ***Ying Zhi Jie:*** According to AIC registration information, Binhai is a wholly owned subsidiary of Ying Zhi Jie. The legal representative and chairman of Ying Zhi Jie is Cheng Jun (Cheng Weihong's brother), who is also the chairman of Binhai. The supervisor of Ying Zhi Jie is Cheng Tao (Cheng Weihong's nephew), who holds the same role at Binhai and Hengjia. The vice chairman of Ying Zhi Jie is Qiao Bin, who is a director of Binhai. The director and general manager of Ying Zhi Jie is Zhang Haihong, who is a director and manager of Binhai.

50.     In summary, Binhai, which was purportedly one of the Company's major customers, shares the same registered address, executive director and general manager as two of the Company's main operating subsidiaries. The chairman of Binhai is the brother of Defendant Cheng Weihong and is also the chairman of Ying Zhi Jie, one of the Company's major suppliers. The supervisor of Binhai is also the supervisor of Ying Zhi Jie and Hengjia, and is the nephew of Defendant Cheng Weihong. A director of Binhai is the vice chairman of Ying Zhi Jie. Finally, a director and manager of Binhai is also a director and general manager of Ying Zhi Jie.

**The Company's Insiders Fraudulently Divert Millions of Dollars for Their Own Benefit**

51.     Defendants Tong Shiping and Cheng Weihong control the Company through family relations and other entities under their control.

52.     Unbeknownst to investors, while she was both a director and officer of the Company, Cheng Weihong also owned and operated a web of interrelated companies which are also engaged in importing and reselling automobiles, in direct competition with the Company. Tong Shiping had knowledge of, and benefitted from, his wife's dealings at all times. Cheng Weihong's affiliated businesses include Mighty Mark Investments Limited, Mega Convention Group Limited, World Vast International Enterprise Limited, Tianjin Calistar Automall Operation Management Co. LTD., Tianjin Calistar Industrial Co. LTC, and Calistar Automotive Sales and Services Co. LTD. These entities were controlled by Cheng Weihong and Tong Shiping and were created for the purpose of fraudulently siphoning profits from China Auto.

53.     Mighty Mark Investments Limited ("Might Mark") is a company registered in the British Virgin Islands, which imports and re-sells cars through its subsidiary, Mega Convention Group Limited ("MCG"). Mighty Mark is based in Hong Kong, and is wholly-owned by Cheng Weihong.

54.      MCG is a company is headquartered in British Virgin Islands, which operated as a subsidiary of Mighty Mark. MCG is an investment holding company, which imports and retails cars and provides related services in the PRC.

55.     World Vast International Enterprise Limited ("WVIE") was a wholly-owned subsidiary of MCG. Cheng Weihong was its director.

56.     Tianjin Calistar Auto Mall Operation Management Co. Ltd. ("Calistar Automall") was a wholly-owned subsidiary of WVIE.

57.     Cheng Weihong is the 99% shareholder, executive director and manager of Tianjin Calistar Industrial Co. Ltd.

58.     On June 2, 2016, Calistar Automall entered into a "Strategic Cooperative Agreement" with Binhai, which is owned and controlled by Cheng Weihong's brother and her nephew. Despite the fact that Binhai's business is exhibition space rental, the Strategic Cooperative Agreement with Calistar Automall requires Binhai to sell parallel imported cars to Calistar Automall. Binhai also agreed to deal with all importing procedures including logistics, customs clearance and tax affairs.

59.     However, Binhai does not import cars into China, so to honor the agreement it must purchase cars from a parallel importer. Indeed, according to the allegations of the Derivative Complaint, Binhai purchases imported cars from China Auto, and then resells the cars to entities owned and controlled by Cheng Weihong. Binhai buys imported cars from the Company *at below market prices* and then resells them *at below market prices* to entities owned and controlled by Cheng Weihong.

60.     On September 29, 2016, Binhai entered into a noncompetition agreement which stated "that since January 2015 it has not been and will not be, engaged in business similar to" Calistar Automall's business of "the sale and trading of parallel imported autos." Thus, Binhai's sale of parallel imported cars was exclusive to Calistar.

61.     The terms of the Strategic Cooperative Agreement are unusually favorable to Calistar Automall. Among other things, the Strategic Cooperative Agreement requires Binhai to sell cars to Calistar Automall at the lowest price available from third parties in the market, regardless of the price Binhai paid or whether that sale would result in a loss to Binhai. At the same time, Calistar Automall guaranteed to cover any losses to Binhai as a result of a sale price

that was too low to cover Binhai's costs. In essence, the Strategic Cooperative Agreement was designed so that Binhai neither loses nor makes any money on the sale of imported cars to Calistar Automall because, after accounting for transfer payments, Binhai sells all its cars to its only customer, Calistar Automall, at their cost.

62.     According to the allegations of the Derivative Complaint, in this scheme China Auto imports vehicles and then sells them to Binhai at below market prices, at approximately a 0.4% margin (as opposed to the roughly 12% margins their competitors enjoy). Binhai then resells those cars to Calistar Automall at a price and on terms that guarantee Binhai makes no money. Calistar Automall then sells the cars at market prices, earning a high profit margin. Rather than China Auto selling these cars itself and reaping the higher margins, the profits are diverted to Calistar Automall to benefit Tong Shiping and Cheng Weihong.

63.     Calistar Automall began operations in 2014 and grew very quickly. In 2015 its revenues were approximately $1 million. The following year, Calistar Automall reported revenues of just under $100 million. Calistar Automall was also very profitable, reporting approximately $3.6 million in profits in 2016. That same year, China Auto reported merely $233,000 in profits from operations, after suffering an loss from operations of approximately $6.5 million the previous year.

64.     On September 30, 2016, within three months of Calistar Automall entering the Strategic Cooperative Agreement with Binhai, Cheng Weihong, through Mighty Mark, sold all of the shares in a group of companies including WVIE, Calistar Automall, Tianjin Calistar Industrial Co., and Calistar Automotive Sales and Services Co. LTD. (the "Purchased Entities") to Lisi Group (Holdings) Limited, a Hong Kong corporation ("Lisi"). According to the purchase

documents, the only significant asset of any of the Purchased Entities was the Strategic Cooperative Agreement between Calistar Automall and Binhai.

65.     According to the allegations of the Derivative Complaint, Lisi purchased the shares in the Purchased Entities by payment of Lisi stock to entities owned and controlled by Cheng Weihong. The value of the stock held directly and for the benefit of Cheng Weihong and Tong Shiping now exceeds $400 million. Entities controlled by and benefitting Cheng Weihong and Tong Shiping are now the single largest shareholders of Lisi and control Lisi.

66.     Plaintiffs' own investigator confirmed that Cheng Weihong and Tong Shiping also negotiated a Lisi board position for Tong Xin, the nephew of Tong Shiping. On June 18, 2018, Tong Xin resigned as executive director of Lisi, a position he had held since February 17, 2017. On July 18, 2018, Tong Shiping was appointed executive director of Lisi. On September 28, 2018, Cheng Weihong was appointed as a non-executive director of Lisi.

67.     As of November 2017, China Auto continued to report miniscule operating margins. According to the allegations of the Derivative Complaint, Lisi, on the other hand, has enjoyed operating margins considerably higher and in line with the industry average - approximately 12% - with revenues comparable to China Auto's. In fact, Lisi reported sales of approximately $200 million in the first six months after its purchase of Calistar Automall, almost exactly the same revenue as China Auto during that time but with much higher margins.

68.     According to the allegations of the Derivative Complaint, in 2017, China Auto sold cars valued at more than $100 million to Lisi through the Purchased Entities and Binhai in a scheme to defraud the shareholders of China Auto and to divert profits to the benefit of Tong Shiping and Cheng Weihong.

69.     On October 9, 2018, Lisi announced it would acquire Binhai. According to the allegations of the Derivative Complaint, the Company continues to sell imported cars to Lisi at well below market value, which Lisi then resells at market value.

### GAAP Required Defendants to Disclose the Related Party Transactions

70.     The Company was plainly aware of its duty to disclose material related party transactions, as imposed by GAAP and SEC regulations. In fact, the Company disclosed, in detail, a number of other related party transactions in its quarterly and annual reports filed with the SEC both during and prior to the Class Period.

71.     GAAP (Generally Accepted Accounting Principles) constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

72.     The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

73.     SEC and NASDAQ rules and regulations require that publicly traded companies such as China Auto include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

74.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles **will be presumed to be misleading or inaccurate**." 17 C.F.R. § 210.4-01(a)(1).[4]

75.     Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility … Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management…. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

76.     GAAP Statement of Financial Accounting Standards ("SFAS") required the Company to disclose all material related party transactions. Specifically, SFAS No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; 850-10-50-1.

77.     "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1; 850-10-05-3.

78.     "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b); 850-10-20.

---

[4] Emphasis is added unless otherwise indicated.

79.     "Immediate family" is defined as "Family members whom a principal owner or a member of management might control or influence or by whom they might be controlled or influenced because of the family relationship." SFAS No. 57 ¶ 24(c).

80.     Disclosures of related party transactions must include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; 850-10-50-1.

81.     Chinese GAAP is substantially the same as GAAP as they both require disclosure of material related party transactions. ABSE 36 (the applicable Chinese GAAP) requires disclosure in the financial statements of related party transactions. The definition of related parties is materially the same as SFAS 57. A translated copy of ABSE 36 is attached hereto as Exhibit 1 and is referenced herein.

**SEC Regulations Mandate Disclosure of the Related Party Transactions**

82.     SEC Regulation S-K ("Reg. S-K") (together with the General Rules and Regulations under the Securities Act of 1933 and the Exchange Act and the forms under these Acts) states the requirements applicable to the content of the non-financial statement portions of the annual reports on form 10-K, quarterly reports on form 10-Q and proxy statements on from 14A. *See* Reg. SK, § 229.10.

83.     Reg. S-K § 229.404, Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or

any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

84.     Reg. S-K required the disclosure of detailed information concerning related party transactions exceeding $120,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.

85.     A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder. Immediate family is defined as a person's spouse; parents; children; siblings; mothers and fathers-in-law; sons and daughters-in-law; and brothers and sisters-in-law. Reg. S-K § 229.404, Instructions to Paragraph (a) of Item 404.

### Defendants Had a Duty to Disclose Material Related Party Transactions With the Company's Purported Major Customers and Suppliers

86.     While China Auto disclosed in its SEC filings that Jing Dian and Binhai were two of its major customers, and Shi Mao and Ying Zhi Jie were two of its major suppliers, Defendants failed to disclose that those companies were in fact related parties under GAAP and SEC regulation definitions.

87.     According to the 2016 10-K, Jing Dian accounted for 23% of the Company's total net revenues in 2016, and Binhai accounted for 15%. The Company's total net revenue for the same year was $467,060,769, meaning that Jing Dian accounted for **over $100 million** of the Company's 2016 net revenue, and Binhai accounted for **over $70 million**. According to the 17Q3 10-Q, Jing Dian accounted for 10% of the Company's total net revenues in the first nine months of 2017, and Binhai accounted for 17%. The Company's total net revenue for the first nine months

21

of 2017 was $374,524,571, meaning that Jing Dian accounted for over $37 million of the Company's net revenue, and Binhai accounted for over $63 million during that period. These transactions were clearly material.

88.     As alleged in greater detail above, Jing Dian was controlled by Shisheng, China Auto's operating subsidiary. Jing Dian was therefore an affiliate of China Auto, and Defendants had a duty to disclose the Company's transactions with Jing Dian as material related party transactions pursuant to GAAP and SEC rules.

89.     As alleged in greater detail above, the Company also controls Binhai through both family and affiliate relationships. Among other things, Binhai shares the same executive director and general manager as two of the Company's main operating subsidiaries. The chairman of Binhai is the brother of Defendant Cheng Weihong (and brother-in-law of Defendant Tong Shiping) and is also the chairman of Ying Zhi Jie, one of the Company's major suppliers. The supervisor of Binhai is the nephew of Defendant Cheng Weihong and is also the supervisor of both Ying Zhi Jie and Hengjia. Therefore Binhai was both an affiliate of China Auto and a related party through immediate family, and Defendants had a duty to disclose the Company's transactions with Binhai as material related party transactions pursuant to GAAP and SEC rules.

90.     According to the 2016 10-K, Shi Mao accounted for 16% of the Company's total net purchases in 2016, and Ying Zhi Jie accounted for 12%. The 2016 10-K states that "our cost of revenue consists primarily of the purchase price of imported automobiles." The Company's cost of revenue for 2016 was $464,099,427. Thus, using the Company's cost of revenues as an approximation for the Company's net purchases, Shi Mao accounted for over $74 million in the Company's purchases in 2016, and Ying Zhi Jie accounted for over $55 million. These transactions were plainly material.

91.     As alleged in greater detail above, Shi Mao had the same executive director as Jing Dian, which was an affiliate of the Company. Thus Shi Mao was an affiliate of China Auto, and Defendants had a duty to disclose the Company's transactions with Shi Mao as material related party transactions pursuant to GAAP and SEC rules.

92.     As alleged in greater detail above, Ying Zhi Jie shares the same chairman as Binhai: Cheng Jun, the brother of Defendant Cheng Weihong (and brother-in-law of Defendant Tong Shiping). The supervisor of Ying Zhi Jie is Cheng Tao, Cheng Weihong's nephew. The vice chairman of Ying Zhi Jie is a director of Binhai, and the director and general manager of Ying Zhi Jie is a director and manager of Binhai. Ying Zhi Jie is therefore both an affiliate of China Auto and a related party through immediate family control, and Defendants had a duty to disclose the Company's transactions with Ying Zhi Jie as material related party transactions pursuant to GAAP and SEC rules.

### Duties of the Director Defendants

93.     As directors of China Auto, the Director Defendants had direct and/or indirect control over the primary wrongdoing alleged here.

94.     According to the Company's SEC filings, the Audit Committee is responsible for overseeing the Company's corporate accounting, financial reporting practices, audits of financial statements and the quality and integrity of the Company's financial statements and reports. The Audit Committee also oversees the qualifications, independence and performance of the Company's independent auditors. The Audit Committee operates under the Audit Committee Charter, a copy of which is available on the Company's website at http://www.chinaautologisticsinc.com/downloads/audit-committee-charter.pdf.

95.     The Audit Committee Charter states that the primary function of the Audit Committee is:

> 1. Reviewing the financial reports and other financial related information released by the Company to the public, or in certain circumstances, governmental bodies;
>
> 2. Reviewing the Company's system of internal controls regarding finance, accounting, business conduct and ethics and legal compliance that management and the Board have established;
>
> 3. Reviewing the Company's accounting and financial reporting processes;
>
> […]

96.     The Audit Committee Charter also states that the Audit Committee's responsibilities and duties include:

**Documents/Reports Review**

> 1. Review and reassess the adequacy of this Charter on an annual basis or as conditions dictate.
>
> 2. Review and approve the Company's Business Conduct policies.
>
> 3. Discuss with management and the independent auditors, the annual audited financial statements and other reports and financial and related information released to the public, or in certain circumstances governmental bodies, including any certification, attestation, report, opinion or review rendered by the independent auditors.
>
> 4. Discuss with management and the independent auditors, as necessary, the quarterly financial information. The Chairperson of the Committee may represent the entire Committee for purposes of this review.
>
> […]

**Financial Reporting Process**

> 1. In consultation with the independent auditors, review the integrity of the Company's financial reporting process, both internal and external.

    2. Review and consider the independent auditors' judgments about the appropriateness of the Company's accounting principles as applied in its financial reporting.

    3. Review and consider major changes to the Company's accounting principles and practices as proposed by management or the independent auditors.

[…]

**Ethical and Legal Compliance**

    1. Establish procedures for the review, treatment, and retention of complaints or concerns received by the Company regarding accounting, internal accounting controls, or auditing matters, including enabling employees to submit concerns regarding questionable accounting or auditing matters confidentially and anonymously, and review management's disclosure of any frauds that involve management or other employees who have a significant role in internal control.

    2. Review the Company's operations and determine whether management has established and maintains effective programs and processes to ensure compliance with its Business Conduct policies.

    3. Review management's programs and processes for risk management and protection of the Company's assets and business.

    4. Review management's monitoring of the Company's compliance with the above programs to ensure that management has the proper review system in place to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

    5. Review, with the Company's counsel, legal compliance matters, including corporate securities trading policies.

    6. Review, with the Company's counsel, any legal matter that could have a significant impact on the Company's financial statements.

    7. Perform any other activities consistent with this Charter, the Company's By-laws and government law, as the Committee or the Board deems necessary or appropriate.

    97. According to the Company's SEC filings, the Nominating and Corporate Governance Committee "oversees our adherence to our corporate governance standards." The Nominating and Corporate Governance Committee operates under the Nominating Committee

25

Charter, a copy of which is available on the Company's website at
http://www.chinaautologisticsinc.com/downloads/governance-and-nominating-committee-
charter.pdf.

98.     The Nominating Committee Charter states that: "[t]he responsibilities and duties
of the Committee shall include:"

### Conflicts of Interest

- Review and monitor compliance with the Company's Code of Business
  Conduct and Ethics;

- Consider questions of possible conflicts of interest of members of the
  Board and of corporate officers; and

- Review actual and potential conflicts of interest of members of the
  Board and corporate officers, and clear any involvement of such persons
  in matters that may involve a conflict of interest.

99.     The Director Defendants had direct or indirect control of the alleged materially
false and misleading statements alleged herein. Additionally, the Director Defendants had
knowledge of, or were reckless in not knowing of, the fraudulent scheme perpetrated by the
Company's officers and the fact that the Company's major customers and suppliers were actually
related parties.

**Defendants Made Materially False and Misleading Statements and Omissions**

**2016 10-K**

100.    On March 28, 2017, China Auto filed an annual report on Form 10-K for the fiscal
year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's
annual financial statements and position. The 2016 10-K was signed by each of the Individual
Defendants and each of the Director Defendants.

26

101.    The 2016 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Tong Shiping and Wang Xinwei, attesting to the accuracy of the 2016 10-K. Tong Shiping and Wang Xinwei each certified that the 2016 10-K "does not contain any untrue [or misleading] statement of a material fact." Tong Shiping and Wang Xinwei also each certified that they disclosed to the Company's auditor and audit committee "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

102.    These statements were false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that (1) the Company had engaged in material related party transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie; and (2) the Company's insiders, including Tong Shiping and his wife, Cheng Weihong, caused the Company to engage in a fraudulent scheme to divert profits from the Company to entities owned and controlled by Cheng Weihong.

103.    The 2016 10-K listed the following related party transactions:

(**13**)                    **Related Party Balances and Transactions**

Ms. Cheng Weihong (the Senior Vice President and Chairwoman of Shisheng and wife of China Auto's President and Chief Executive Officer, Mr. Tong Shiping) made non-interest bearing loans to the Company from time to time to meet working capital needs of the Company. For the years ended December 31, 2016 and 2015, the Company made aggregate borrowings from Ms. Cheng Weihong of $686,185 and $599,120, respectively, and made repayments of $0 and $454,280 to Ms. Cheng Weihong. As of December 31, 2016 and 2015, the outstanding balances due to Ms. Cheng Weihong were $1,550,745 and $722,028, respectively.

The Company's former shareholder, Sino Peace Limited, paid certain accrued expenses in the previous years on behalf of the Company. The amounts of $1,956,625 and $2,093,182 were outstanding as payable related to prior years'

professional fees on the consolidated balance sheets as of December 31, 2016 and 2015, respectively. In January 2015, December 2016, and February 2017, the Company received notification from an individual who claimed to be the owner of St. George International Limited ("St. George") and made a claim that the debt owed to Sino Peace by the Company had been transferred to St. George. However, the Company neither received any evidence to support such assignment nor any notification from the owner of Sino Peace that Sino Peace was transferring its legal right of collecting the receivable from the Company to St. George. The Company has been unable to locate the owner of Sino Peace to confirm such transfer and therefore considers such claim by St. George legally unbinding at this time.

The balances as discussed above as of December 31, 2016 and 2015 are interest-free, unsecured and have no fixed term of repayment. During the years ended December 31, 2016 and 2015, there was no imputed interest charged in relation to these balances.

On September 1 2015, the Company and Tongshang Kai Li (Tianjin) Automobile Import Export Company Limited ("Tongshang Kai Li") entered into a Loan Agreement (the "Loan Agreement"). Pursuant to the terms of the Loan Agreement, Tongshang Kai Li advanced funds, at an annual interest rate of 15%, to the Company for the Company's short term working capital needs until December 31, 2015; the expiration date of the Loan Agreement. During the year ended December 31, 2015, the Company borrowed a total of $1,457,982 which incurred interest of $148,534. As of December 31, 2015 there were no outstanding balances due to Tongshang Kai Li as all amounts were repaid.

Tongshang Kai Li is 51% owned by Tianjin Kai Li Xing Kong Real Property Limited Co. ("Tianjin Kai Li"), and 49% owned by Ningbo Tong Shang Rong Chuang Investment Limited Co.. Ms. Cheng Weihong, a Director and Senior Vice President of the Company, owns 99% of Tianjin Kai Li. Therefore, Ms. Cheng Weihong has 50.49% of beneficial ownership in Tongshang Kai Li.

Mr. Tong Shiping and Ms. Cheng Weihong personally guarantee borrowings on various lines of credit related to our financing services and short-term borrowings.

104.    These statements were false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that (1) the Company had engaged in material related party transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie; and (2) the Company's insiders, including Tong Shiping and his wife, Cheng

Weihong, caused the Company to engage in a fraudulent scheme to divert profits from the Company to entities owned and controlled by Cheng Weihong.

105.    The 2016 10-K also reported that Jing Dian and Binhai were "major customers who individually accounted for over 10% of our total net sales," and that Shi Mao and Ying Zhi Jie were "major suppliers who individually accounted for more than 10% of our total net purchases" for 2016. The 2016 10-K also stated that:

> Some of our clients are both our customers and suppliers. None of the activities transacted between the Company and clients who are both customers and suppliers involved any commitments between the parties to repurchase identical automobiles. We maintain close working relationships with our top customers and suppliers, although we also continue to diversify our customers and suppliers. We do not believe that the loss of any one major customer or supplier in and of itself would have a material adverse effect on our financial condition or results of operations. We have long-term relationship with our major suppliers. Even though we do not foresee any interruption in our relationship with our suppliers in the near future, we believe that there are other suppliers available to supply automobiles to us at reasonable terms if we lose any of our major suppliers. The major customers and suppliers stated above guarantee certain of our borrowings with the banks.

106.    These statements were misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that the Company's material transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie, were in fact related party transactions. Defendants failed to disclose that each of these companies was an affiliate of China Auto and/or controlled by immediate family of Defendants, who controlled China Auto. With respect to these transactions, Defendants failed to disclose the information required by GAAP and SEC regulations concerning material related party transactions.

29

**17Q1 10-Q**

107.    On May 15, 2017, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "17Q1 10-Q"). The 17Q1 10-Q was signed by Defendants Tong Shiping and Wang Xinwei.

108.    The 17Q1 10-Q contained SOX certifications signed by Defendants Tong Shiping and Wang Xinwei attesting to the accuracy of the 17Q1 10-Q. Tong Shiping and Wang Xinwei each certified that the 17Q1 10-Q "does not contain any untrue [or misleading] statement of a material fact." Tong Shiping and Wang Xinwei also each certified that they disclosed to the Company's auditor and audit committee "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

109.    These statements were false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that (1) the Company had engaged in material related party transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie; and (2) the Company's insiders, including Tong Shiping and his wife, Cheng Weihong, caused the Company to engage in a fraudulent scheme to divert profits from the Company to entities owned and controlled by Cheng Weihong.

110.    In the 17Q1 10-Q, the Company disclosed certain related party transactions. The transactions disclosed in the 17Q1 10-Q were substantially identical to those disclosed in the 2016 10-K, with balances updated as of the end of the first quarter of 2017.

30

111.    These statements were false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that (1) the Company had engaged in material related party transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie; and (2) the Company's insiders, including Tong Shiping and his wife, Cheng Weihong, caused the Company to engage in a fraudulent scheme to divert profits from the Company to entities owned and controlled by Cheng Weihong.

112.    The 17Q1 10-Q also reported that Jing Dian and Binhai were "major customers who individually accounted for over 10% of our total net sales," and that Ying Zhi Jie was a "major supplier[] who individually accounted for more than 10% of our total net purchases" for the first quarter of 2017.

113.    These statements were misleading because Defendants failed to disclose that the Company's material transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie, were in fact related party transactions. Defendants failed to disclose that each of these companies was an affiliate of China Auto and/or controlled by immediate family of Defendants, who controlled China Auto. With respect to these transactions, Defendants failed to disclose the information required by GAAP and SEC regulations concerning material related party transactions.

**17Q2 10-Q**

114.    On August 14, 2017, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30,

2017 (the "17Q2 10-Q"). The 17Q2 10-Q was signed by Defendants Tong Shiping and Wang Xinwei.

115.     The 17Q2 10-Q contained SOX certifications signed by Defendants Tong Shiping and Wang Xinwei attesting to the accuracy of the 17Q2 10-Q. Tong Shiping and Wang Xinwei each certified that the 17Q2 10-Q "does not contain any untrue [or misleading] statement of a material fact." Tong Shiping and Wang Xinwei also each certified that they disclosed to the Company's auditor and audit committee "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

116.     These statements were false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that (1) the Company had engaged in material related party transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie; and (2) the Company's insiders, including Tong Shiping and his wife, Cheng Weihong, caused the Company to engage in a fraudulent scheme to divert profits from the Company to entities owned and controlled by Cheng Weihong.

117.     In the 17Q2 10-Q, the Company disclosed certain related party transactions. The transactions disclosed in the 17Q2 10-Q were substantially identical to those disclosed in the 2016 10-K, with balances updated as of the end of the second quarter of 2017.

118.     These statements were false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically,

Defendants failed to disclose that (1) the Company had engaged in material related party transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie; and (2) the Company's insiders, including Tong Shiping and his wife, Cheng Weihong, caused the Company to engage in a fraudulent scheme to divert profits from the Company to entities owned and controlled by Cheng Weihong.

119.    The 17Q2 10-Q also reported that Jing Dian and Binhai were "major customers who individually accounted for over 10% of our total net sales," and that Shi Mao and Ying Zhi Jie were "major suppliers who individually accounted for more than 10% of our total net purchases" for the second quarter of 2017.

120.    These statements were misleading because Defendants failed to disclose that the Company's material transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie, were in fact related party transactions. Defendants failed to disclose that each of these companies was an affiliate of China Auto and/or controlled by immediate family of Defendants, who controlled China Auto. With respect to these transactions, Defendants failed to disclose the information required by GAAP and SEC regulations concerning material related party transactions.

**17Q3 10-Q**

121.    On November 14, 2017, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2017 (the "17Q3 10-Q"). The 17Q3 10-Q was signed by Defendants Tong Shiping and Wang Xinwei.

122.    The 17Q3 10-Q contained SOX certifications signed by Defendants Tong Shiping and Wang Xinwei attesting to the accuracy of the 17Q3 10-Q. Tong Shiping and Wang Xinwei

each certified that the 17Q3 10-Q "does not contain any untrue [or misleading] statement of a material fact." Tong Shiping and Wang Xinwei also each certified that they disclosed to the Company's auditor and audit committee "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

123.    These statements were false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that (1) the Company had engaged in material related party transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie; and (2) the Company's insiders, including Tong Shiping and his wife, Cheng Weihong, caused the Company to engage in a fraudulent scheme to divert profits from the Company to entities owned and controlled by Cheng Weihong.

124.    In the 17Q3 10-Q, the Company disclosed certain related party transactions. The transactions disclosed in the 17Q3 10-Q were substantially identical to those disclosed in the 2016 10-K, with balances updated as of the end of the third quarter of 2017.

125.    These statements were false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants failed to disclose that (1) the Company had engaged in material related party transactions with its major customers and suppliers, including Binhai, Jing Dian, Shi Mao, and Ying Zhi Jie; and (2) the Company's insiders, including Tong Shiping and his wife, Cheng

Weihong, caused the Company to engage in a fraudulent scheme to divert profits from the Company to entities owned and controlled by Cheng Weihong.

126.    The 17Q3 10-Q also reported that Jing Dian and Binhai were "major customers who individually accounted for over 10% of our total net sales" for the first nine months of 2017.

127.    This statement was misleading because Defendants failed to disclose that the Company's material transactions with its major customers, including Binhai and Jing Dian, were in fact related party transactions. Defendants failed to disclose that each of these companies was an affiliate of China Auto and/or controlled by immediate family of Defendants, who controlled China Auto. With respect to these transactions, Defendants failed to disclose the information required by GAAP and SEC regulations concerning material related party transactions.

### The Company Admits to Additional Undisclosed Related Party Transactions, But Makes Additional False and Misleading Statements

128.    On April 2, 2018, before market-open, China Auto reported on Form NT 10-K that: (1) it was unable to timely file its Form 10-K for the period ended December 31, 2017 with the SEC because it needed extra time to "identify certain related party transactions"; and (2) it "identified a material weakness in internal controls and procedures over identifying and reporting certain relationships and related transactions." The release stated, in pertinent part:

> The Registrant is unable to file its Annual Report on Form 10-K for the period ended December 31, 2017 within the prescribed time period without unreasonable effort and expense because ***extra time is needed to identify certain related party transactions*** and the impact of such transactions for the preparation of the financial statements for the Form 10-K.
>
> ***The Registrant identified a material weakness in internal controls and procedures over identifying and reporting certain relationships and related transactions***. This material weakness in the control environment contributed to delays in compiling the information for the preparation of the financial statements and disclosure involving related transactions for the Form 10-K which could not be eliminated without unreasonable effort or expense.

35

The Registrant has determined that the identified material weakness would impact its disclosures in the financial statements and Form 10-K but ***expects to correct this material weakness by implementing additional procedures in the first half of 2018***. The Registrant is working diligently with its auditors to complete its Annual Report on Form 10-K and expects to file its Form 10-K no later than fifteen days following its prescribed due date.

129.    These statements revealed for the first time that the Company had additional undisclosed related party transactions and a material weakness in its internal controls that it had not disclosed previously. On this news, the Company's shares fell $0.66 or over 19% to close at $2.79 on April 2, 2018.

130.    These statements were misleading because they failed to disclose the fraudulent scheme, but rather downplayed the issue as simply needing more time to identify related party transactions. The Company's statement that it "expects to correct this material weakness by implementing additional procedures in the first half of 2018," was false and misleading because the Company was not addressing the material weakness, but rather taking steps to conceal the related party transactions and fraudulent scheme described above.

131.    On April 10, 2018, before market-open, China Auto revealed in a Form 8-K filed with the SEC that its "Audit Committee deemed it advisable" to initiate an investigation into allegations of related party transactions from a Company shareholder. As detailed in the Derivative Complaint, which was filed on April 6, 2018, the shareholders' allegations pertained to the fraudulent scheme to divert China Auto's profits through related parties to Calistar, Lisi, and other entities controlled by Cheng Weihong. The Company's release stated, in pertinent part:

After receiving allegations of related party transactions from a shareholder of the Registrant, the Audit Committee deemed it advisable to initiate an investigation into such allegations (the "Investigation"). The Registrant is in the process of retaining independent counsel to assist with the Investigation and ***intends to cooperate fully with the Investigation.***

As a result of the foregoing, the Registrant's Form 10-K for the period ended December 31, 2017 (the "Form 10-K") due to be filed on April 17, 2018 will be

delayed. Once the Investigation is completed the Registrant plans to file the Form 10-K.

132.   These statements revealed for the first time that the Company planned to retain independent counsel for an internal investigation of a shareholders' allegations of related party transactions.

133.   The statement that the Company "intends to cooperate fully with the Investigation" was false and misleading because the Company had no intent to cooperate with the investigation. In fact, the Company's officers did all they could to thwart the investigation by taking employees phones and refusing to provide the independent counsel with access to its employees, offices, and other evidence. The statement that "Once the Investigation is completed the Registrant plans to file the Form 10-K" was false and misleading because the Company never intended to complete the investigation and in fact was actively obstructing it.

134.   On April 13, 2018, after trading hours, China Auto filed a Form 8-K with the SEC reporting that its stock faced potential delisting from NASDAQ for the Company's failure to timely file a Form 10-K for the period ended December 31, 2017. The Company also reported that the Audit Committee's investigation was "the reason for the Company's inability to timely file its Form 10-K." The release stated, in pertinent part:

**Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

On April 10, 2018, China Auto Logistics Inc. (the "Company") received notification from the Listing Qualifications Department of The Nasdaq Stock Market, Inc. ("Nasdaq") that, as a result of the Company's inability to file its Annual Report on Form 10-K for the period ended December 31, 2017 (the "Form 10-K") by the expiration of the extension period under Rule 12b-25 promulgated under the Securities Exchange Act of 1934, as amended, the Company no longer complies with the timely filing requirements for continued listing under Rule 5250(c)(1) of the Nasdaq Listing Rules (the "Rules").

Under the Rules, the Company has 60 calendar days, or until June 11, 2018, to submit a plan to regain compliance with the Rules (a "Plan") and, if the Plan is accepted by Nasdaq, then Nasdaq may grant an extension until October 15, 2018

for the Company to regain compliance. If Nasdaq does not accept the Plan, then the Company may appeal such decision to a Nasdaq Hearings Panel.

As disclosed in a Current Report on Form 8-K filed on April 10, 2018, the Audit Committee of the Company's Board of Directors has initiated an independent investigation, which investigation is the reason for the Company's inability to timely file its Form 10-K. ***The Company intends to fully cooperate with the investigation*** and, once completed, file the Form 10-K as soon as practicable thereafter. ***The Company also intends to submit a Plan to Nasdaq within the time period set forth above, including details on the investigation and its results***, and take any other steps necessary to regain compliance with the Rules.

135.    This report revealed for the first time that NASDAQ had notified the Company of the Company's potential delisting due to its failure to timely file its 2016 annual report. On this news, the Company's shares fell $0.24 or over 8.9% to close at $2.45 on April 16, 2018.

136.    The statement that the Company "intends to fully cooperate with the investigation" was false and misleading because the Company had no intent to cooperate with the investigation. In fact, the Company's officers did all they could to thwart the investigation by taking employees phones and refusing to provide the independent counsel with access to its employees, offices, and other evidence. The statement that the Company "intends to submit a Plan to Nasdaq within the time period set forth above, including details on the investigation and its results" was false and misleading because the Company did not intend to complete the investigation and therefore had no intention of disclosing to NASDAQ any details on the investigation or its results.

137.    On May 16, 2018, China Auto reported in a Form 8-K filed with the SEC that it was unable to timely file its Form 10-Q for the quarter ended March 31, 2018 due to the Audit Committee's investigation into the related party transactions. The Company also reported that it had "retained independent counsel to assist with the Investigation." The release stated, in pertinent part:

As disclosed on the Current Report on Form 8-K filed on April 10, 2018, after receiving allegations of related party transactions from a shareholder of the Registrant, the Audit Committee deemed it advisable to initiate an investigation

38

into such allegations (the "Investigation"). The Audit Committee has retained independent counsel to assist with the Investigation and ***the Company intends to cooperate fully with the Investigation.***

As a result of the foregoing Investigation, the Registrant is unable to file its Quarterly Report on Form 10-Q for the period ended March 31, 2018 within the prescribed time period because extra time is needed to complete the Investigation and identify the impact of certain transactions for the preparation of the financial statements for the Form 10-Q.

While ***the Registrant is working diligently with its auditors and independent counsel*** to complete its Quarterly Report on Form 10-Q, the Registrant does not expect to file its Form 10-Q before the fifth calendar day following the prescribed date.

138.    The highlighted statements were false and misleading because the Company had no intent to cooperate with the investigation. In fact, the Company's officers did all they could to thwart the investigation by taking employees phones and refusing to provide the independent counsel with access to its employees, offices, and other evidence. Far from "working diligently with its auditors and independent counsel," the Company was actively stonewalling the investigation.

139.    On June 1, 2018, China Auto filed a Form 8-K with the SEC, reporting that its stock faced potential delisting from NASDAQ for the Company's failure to timely file a Form 10-Q for the period ended March 31, 2018 and the previously disclosed Form 10-K for the period ended December 31, 2017. The release stated, in pertinent part:

**Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing**.

On May 29, 2018, China Auto Logistics Inc. (the "Company") received notification from the Listing Qualifications Department of The Nasdaq Stock Market, Inc. ("Nasdaq") that, as a result of the Company's inability to file its Quarterly Report on Form 10-Q for the period ended March 31, 2018 (the "Form 10-Q") and, as previously disclosed, its Annual Report on Form 10-K for the period ended December 31, 2017 (the "Form 10-K") by the expiration of the applicable extension periods under Rule 12b-25 promulgated under the Securities Exchange Act of 1934, as amended, the Company does not comply with the timely filing requirements for continued listing under Rule 5250(c)(1) of the Nasdaq Listing Rules (the "Rules").

As previously disclosed in a Current Report on Form 8-K filed on April 13, 2018, the Company has until June 11, 2018, to submit a plan to regain compliance with the Rules (a "Plan") and, if the Plan is accepted by Nasdaq, then Nasdaq may grant an extension until October 15, 2018 for the Company to regain compliance. If Nasdaq does not accept the Plan, then the Company may appeal such decision to a Nasdaq Hearings Panel.

As disclosed in a Current Report on Form 8-K filed on April 10, 2018, the Audit Committee of the Company's Board of Directors has initiated an independent investigation, which investigation is the reason for the Company's inability to timely file its Form 10-K and Form 10-Q. ***The Company intends to fully cooperate with the investigation*** and, once completed, file the Form 10-K and the Form 10-Q as soon as practicable thereafter. The Company also intends to submit a Plan to Nasdaq within the time period set forth above, including details on the investigation and its results, and take any other steps necessary to regain compliance with the Rules.

140.    The statement that the Company "intends to fully cooperate with the investigation" was false and misleading because the Company had no intent to cooperate with the investigation. In fact, the Company's officers did all they could to thwart the investigation by taking employees phones and refusing to provide the independent counsel with access to its employees, offices, and other evidence.

141.    On June 11, 2018, China Auto filed a Form 8-K with the SEC, reporting that the Company had "submitted its plan to Nasdaq detailing how the Company plans to regain compliance with Nasdaq's continued listing requirements."

**Defendants Attempt to Cover Up Their Fraud and Obstruct the Internal Investigation**

142.    On July 17, 2018, at 7:16 a.m., China Auto filed a Form 8-K with the SEC, reporting the resignations of Tong Shiping, Wang Xinwei, and Yu Jun as directors and officers of the Company.[5] The Form 8-K reported that Tong Shiping and Wang Xinwei resigned on June 29, 2018, and Yu Jun resigned on June 30, 2018. The release stated, in pertinent part:

---

[5] Yu Jun had been appointed by the Board to fill the vacancy created by the December 10, 2017 resignation of Cheng Weihong from her positions as director and Senior Vice President.

The foregoing Directors and Officers of the Company resigned as a result of a police investigation (the "PRC Investigation") initiated by certain employees of the Company in The People's Republic of China alleging violations of data privacy and unlawful forfeiture of personal electronics and email accounts ***arising out of the requests of the Audit Committee and its legal advisor in connection with the internal investigation*** disclosed in a Current Report on Form 8-K filed on April 10, 2018. The Company has responded to the PRC Investigation, which it now believes is moving onto the legal advisor handling the internal investigation on behalf of the Audit Committee of the Board of Directors.

143.    This report revealed for the first time that the Company's CEO and CFO had resigned two weeks prior as a result of a police investigation connected with the internal investigation into the alleged undisclosed related party transactions. However, these statements were misleading because they gave the false impression that the officers' resignations and misconduct had been taken *in support of* the internal investigation, when in fact the officers' misconduct stemmed from their attempts to *actively interfere with* the investigation.

144.    On July 17, 2018, at 9:31 a.m., NASDAQ announced that trading in China Auto stock had been halted at 6:55 a.m. NASDAQ also stated that trading would remain halted until the Company fully satisfied NASDAQ's request for additional information. The same day, the Company received a letter from NASDAQ under Listing Rule 5250(a) specifically requesting additional information relating to the executive resignations, the PRC police investigation and the Company's internal investigation.

145.    On July 27, 2018, China Auto filed a Form 8-K with the SEC, reporting that Defendant Howard Barth had resigned from his position as Chair of the Audit Committee and a director of the Company on July 18, 2018. Attached to the report was a copy of Howard Barth's resignation letter, which stated in pertinent part:

---

Previously, Yu Jun had served as a Vice President (Human Resources and General Administration) for the Company since 2011.

I hereby resign, effective immediately, from my positions as Chair of the Audit Committee and as a Director of China Auto Logistics Inc. ("Company"). I believe it is important for me to inform you of the reasons for my resignation.

In 2018, I, as Chair of the Audit Committee, became aware of certain allegations made against the Company and certain members of its management. […]

Accordingly, the Audit Committee retained competent and highly experienced counsel at a global law firm to assist in its investigation. However, the active non-cooperation of the Company has prevented the Audit Committee and its counsel from uncovering the evidence necessary to ascertain the truth or inaccuracy of the allegations. In particular, management of the Company has prevented the Audit Committee's counsel from engaging in any efforts to collect physical and electronic evidence necessary to effectively pursue our investigation or otherwise engage in the investigation. The efforts to impede our investigation have gone so far as to deny the Audit Committee's counsel permission to interview, or even to communicate with, the Company's officers, employees or relevant staff or to even physically visit the office premises. As such, counsel for the Audit Committee was never permitted on-site at the Company nor was it permitted to speak with management or any employees much less actually conduct any document collection.

146.    The disclosure of Defendant Howard Barth's resignation letter was the first time that the market learned that the Company and its officers had in fact been actively impeding the independent counsel's internal investigation in an effort to cover up their fraudulent scheme of related party transactions.

147.    Also on July 27, 2018, China Auto filed a Form 8-K with the SEC, reporting that the Company had not provided a response to NASDAQ's request for additional information relating to the officer resignations, the PRC police investigation and the internal investigation by the July 20, 2018 deadline. The Company also reported that:

On July 24, 2018, the Company received a further letter from Nasdaq, which stated that, given the foregoing, Nasdaq concluded that the Company did not provide a definitive plan evidencing the Company's ability to achieve compliance with Listing Rule 5250(c)(1). The letter stated that the Company has not provided public disclosure regarding its current financial status or the timing for the completion of the Internal Investigation and, as such, prospective and current investors do not have information they need to make an investment decision in the securities of the Company. The letter further noted the Company's failure to respond to Nasdaq's

request for information pursuant to Listing Rule 5250(a) and that therefore Nasdaq does not have information necessary to evaluate the Company's suitability for continued listing.

Nasdaq therefore determined that the Company's securities will be delisted from The Nasdaq Stock Market.

The Company does not plan to request an appeal of Nasdaq's foregoing determination. Accordingly, trading of the Company's common stock will be suspended at the opening of business on August 1, 2018, and a Form 25-NSE will be filed with the SEC, which will remove the Company's securities from listing and registration on The Nasdaq Stock Market.

148.    This report marked the first time the market learned that the Company had failed to respond to NASDAQ's request for additional information concerning the officer resignations, police investigation, and internal investigation, and that as a result, NASDAQ would be delisting China Auto's stock.

149.    The price of China Auto stock was $2.37 on July 16, 2018. NASDAQ halted trading before market open on July 17, 2018. After NASDAQ announced it was suspending trading in and delisting China Auto stock, the stock resumed trading over the counter ("OTC") on the gray market on August 3, 2018. By the end of the day, the price of China Auto stock fell to $0.70, losing over 70% of its value.

150.    On August 27, 2018, the Company filed a Form 8-K with the SEC, reporting that the independent counsel retained by the Audit Committee for the internal investigation had withdrawn from its representation with respect to the investigation on July 30, 2018. The Form 8-K also revealed that "*[t]he Company does not believe that the Investigation will be completed.*" The Company also reported that "[o]n August 21, 2018 the Board authorized and approved both the Company and the Company's wholly-owned subsidiary [Shisheng], to seek bankruptcy protection and undergo reorganization, subject to advice of both U.S. and PRC counsel."

151.    On September 5, 2018, the Company filed a Form 8-K with the SEC, reporting

that the Company's auditor, Marcum Bernstein & Pinchuk LLP, had resigned, effective August

30, 2018. Attached to the September 5, 2018 Form 8-K was a letter from the Company's resigning

auditor. The letter stated, in pertinent part:

> As you are aware and as disclosed in the Company's Form 8-K dated April 10,
> 2018, the Audit Committee of the Company initiated an investigation into certain
> allegations of related party transactions from a shareholder of the Company. The
> shareholder alleged that the Company failed to disclose sales to entities owned and
> controlled by the Company's former CEO, Tong Shipping, and his wife and former
> officer and director, Cheng Weihong.

152.    The auditor's letter was the first time the market learned that the shareholder

allegations referred to in the Company's previous disclosures concerned the Company's failure to

disclose sales to entities owned and controlled by Defendants Tong Shipping and Cheng Weihong.

153.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiffs and other Class members have suffered

significant losses and damages.

### Additional Allegations Demonstrating Scienter and Falsity

154.    On June 2, 2014, the SEC announced the settlement of charges brought against S.

Paul Kelley, a Canadian stock promoter who orchestrated a series of reverse mergers between

Chinese companies and U.S.-listed shells, including China Auto. *In re S. Paul Kelley*, SEC

Administrative Proceeding No. 3-15899. The SEC's complaint alleged that Kelley "engaged in a

scheme to take China Auto and another company public through reverse mergers with public shell

companies, and then manipulate the trading of the issuers." The SEC alleged that Kelley structured

the acquisition of public shell companies and reverse merger transactions with China Auto to

control the free trading shares in the Company's stock. He then orchestrated manipulative trading

to artificially inflate the stock price in order to facilitate the Company's listing on NASDAQ.

44

Pursuant to the settlement, Kelley agreed to pay more than $6 million in disgorgement, penalties and interest.

155.    FE 1 confirmed the existence of undisclosed related party transactions between Shisheng and its affiliated companies. Likewise, Former Employee 4 ("FE 4"), who served as an accounting manager of Shisheng from March 2007 to May 2014 corroborated the existence of undisclosed related party transactions between the Company and its affiliates.[6]

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

156.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired China Auto securities publicly traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

157.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, China Auto securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by China Auto or its transfer agent and may be notified

---

[6] FE 4's responsibilities at Shisheng involved accounting affairs, including financing service of auto sales, as well as the quarterly and annual audits.

45

of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

160.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.   whether the Exchange Act was violated by Defendants' acts as alleged herein;

    b.   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of China Auto;

    c.   whether the Individual Defendants caused China Auto to issue false and misleading financial statements during the Class Period;

    d.   whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

    e.   whether the prices of China Auto securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

    f.   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

161.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

162.    In addition, Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market theory, because China Auto's common stock traded in an efficient market during the Class Period, in that:

a.    Throughout the Class Period, China Auto's common stock shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market. China Auto shares were highly liquid during the Class Period;

b.    As a regulated issuer, China Auto filed periodic public reports with the SEC and the NASDAQ;

c.    The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

d.    On average, approximately 1.35 million China Auto shares, or 33.5% of China Auto's total shares outstanding, were traded weekly, permitting a very strong presumption that its shares traded on an efficient market;

     e.     The market reacted promptly to public information disseminated by the Company, as new, Company-specific information was rapidly reflected in the price of China Auto's shares;

     f.     As a NASDAQ-traded stock, China Auto had a designated market maker which made a market in China Auto's shares; and

     g.     The misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities.

163.    Based upon the foregoing, the market for China Auto securities promptly digested current information regarding China Auto from all publicly-available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

164.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against Defendant China Auto and the Individual Defendants

165.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

166.    This Count is asserted against Defendants China Auto, Tong Shiping, and Wang Xinwei (the "10(b) Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

167.    During the Class Period, the 10(b) Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of China Auto securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire China Auto securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the 10(b) Defendants, and each of them, took the actions set forth herein.

168.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the the 10(b) Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for China Auto securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about China Auto' finances and business prospects.

169.    By virtue of their positions at China Auto, the 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the

49

alternative, the 10(b) Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the 10(b) Defendants. Said acts and omissions of the 10(b) Defendants were committed willfully or with reckless disregard for the truth. In addition, each the 10(b) Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

170.    On July 16, 2018, the day before the Company announced that its CEO and CFO had resigned due to the PRC police investigation, trading volume in China Auto stock was nearly 10 million, more than double the shares outstanding at that time. The 10(b) Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of China Auto securities from their personal portfolios.

171.    Documents showing that the 10(b) Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the 10(b) Defendants' knowledge and control. As the senior managers and/or directors of China Auto, the Individual Defendants had knowledge of the details of China Auto' internal affairs.

172.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of China Auto. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to China Auto' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

the market price of China Auto securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning China Auto' business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired China Auto securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the 10(b) Defendants, and were damaged thereby.

173.    During the Class Period, China Auto securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of China Auto securities at prices artificially inflated by the 10(b) Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of China Auto securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of China Auto securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

174.    By reason of the conduct alleged herein, the 10(b) Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

175.    As a direct and proximate result of the 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective

purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants and the Director Defendants

176.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

177.   During the Class Period, the Individual Defendants and the Director Defendants participated in the operation and management of China Auto, and conducted and participated, directly and indirectly, in the conduct of China Auto' business affairs. Because of their senior positions, they knew the adverse non-public information about China Auto' current financial position and future business prospects.

178.   As officers and/or directors of a publicly owned company, the Individual Defendants and the Director Defendants had a duty to disseminate accurate and truthful information with respect to China Auto' business practices, and to correct promptly any public statements issued by China Auto which had become materially false or misleading.

179.   Because of their positions of control and authority as senior officers, the Individual Defendants and the Director Defendants were able to, and did, control the contents of the various reports, press releases and public filings which China Auto disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants and the Director Defendants exercised their power and authority to cause China Auto to engage in the wrongful acts complained of herein. The Individual Defendants and the Director Defendants therefore, were "controlling persons" of China Auto within the meaning of Section 20(a) of the Exchange Act. In this capacity,

they participated in the unlawful conduct alleged which artificially inflated the market price of China Auto securities.

180.    Each of the Individual Defendants and Director Defendants, therefore, acted as a controlling person of China Auto. By reason of their senior management positions and/or being directors of China Auto, each of the Individual Defendants and Director Defendants had the power to direct the actions of, and exercised the same to cause, China Auto to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants and Director Defendants exercised control over the general operations of China Auto and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

181.    By reason of the above conduct, the Individual Defendants and Director Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by China Auto.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: November 21, 2018                     Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel to Plaintiffs*

54

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of November, 2018, a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence M. Rosen
Laurence M. Rosen